ALEXANDER *v.* SIMS, EXECUTOR.

4-9682                                                    249 S. W. 2d 832

Opinion delivered June 2, 1952.

Rehearing denied July 7, 1952.

L. B. *Smead* and *Joseph Morrison,* for appellant.

*Meehan & Segraves, John D. Thweatt* and *Cooper Thweatt,* for appellee.

ED. F. McFADDIN, Justice. This litigation involves a partnership between Mrs. Alexander, appellant, and Miss Marguerite Sims, now deceased. Beginning in 1942, these ladies engaged in the retail jewelry business in Stuttgart, under the firm name of Sims & Alexander. The partnership continued, with financial success, until terminated by Miss Sims' death, which occurred on April 10, 1950. The executor[1] of her estate (appellee here) brought this suit to have Miss Sims' interest determined in the partnership assets. Mrs. Alexander claimed that all of Miss Sims' interest in the partnership passed to Mrs. Alexander, because of a written agreement, executed October 14, 1949, which agreement is subsequently to be discussed. The Chancery Court refused to give effect to the agreement, and held that Miss Sims' interest in the partnership was the property of her estate. From that decree, Mrs. Alexander prosecutes the present appeal.

A somewhat lengthy recital of facts (as we find them from the voluminous record) is necessary to present the situation leading up to the said agreement, and its subsequent renunciation by Miss Sims:

(a) In the summer of 1949, the partnership of Sims & Alexander decided to borrow money to purchase fixtures for the jewelry store, and the partnership applied to the Reconstruction Finance Corporation (hereinafter referred to as "R.F.C.") and the Prairie County Bank of Hazen, Arkansas (hereinafter called "Bank"), for a loan, which was to be handled 70% by the R.F.C. and 30% by the Bank. While the application was being processed by the R.F.C., and before it was approved by the Bank, Miss Sims became ill.

(b) On September 16, 1949, Miss Sims, aged 48, entered a hospital for diagnosis and treatment, and

---

[1] I. T. Sims, father of Marguerite Sims, is the executor of her estate. He also intervened as an individual.

underwent surgery on September 23rd. On the same day, and immediately after the operation, the attending physician, in a conference with Miss Sims' mother and Mrs. Alexander, advised them that Miss Sims had malignancy (cancer) in an advanced stage; that she would live only a short time, and might die before Christmas, 1949. The physician did not inform Miss Sims of her malignancy until she made direct inquiry on October 15, 1949. That it came as a shock to her, is shown by her emotional reaction on that date, subsequently to be mentioned.

(c)  While Miss Sims was in the hospital, the R.F.C. approved the loan to the partnership of Sims & Alexander, but the officials of the Bank, having learned of Miss Sims' condition, refused to complete any part of the loan unless and until Miss Sims' father (I. T. Sims) would personally guarantee repayment of the entire loan. The preponderance of the evidence in this case (as found by the Chancery Court and by us) discloses that Mrs. Alexander induced Mr. Sims to sign the guaranty on October 8, 1949, by telling Mr. Sims that if and when anything happened to Miss Marguerite Sims, then all her interest in the partnership would belong to Mr. and Mrs. Sims. On the strength of such representations by Mrs. Alexander, Mr. Sims signed the guaranty, and the proceeds of the loan were delivered to Mrs. Alexander for the firm of Sims & Alexander.

(d)  The foregoing was on October 8th; but on October 14th, while Miss Sims was still in the hospital, and before she learned of her malignancy, Mrs. Alexander had an attorney to prepare the agreement on which she relies. She took the agreement to the hospital on October 14th, and she and Miss Sims signed and acknowledged it, and Mrs. Alexander retained both copies. This agreement[2] provides *inter alia* "that in the event of the de-

[2] The entire instrument (omitting only acknowledgments) reads:
"This Agreement made and entered into on the day and date hereinafter set forth, by and between Marguerite E. Sims, hereinafter referred to as First Party, and Helen S. Alexander, hereinafter referred to as Second Party, for and in consideration of the sum of One Dollar in hand paid and mutual covenants and consideration more specifically hereinafter set forth, WITNESSETH:

cease of either of the partners that all of the partnership assets shall *ipso facto* immediately become the sole and exclusive property of the surviving partner . . ."

(e) On October 15, 1949, prior to being taken to her parents' home in Hazen, Miss Sims, for the first time, made explicit inquiry of her physician as to her condition; and the physician frankly told her of the extremely

"Whereas, the parties hereto did during the month of November, 1942, entered into and form a co-partnership in which each of the parties had an equal interest and in which each of the parties hereto invested certain capital and agreed to devote their mutual efforts to said partnership, the same being known as Sims & Alexander, and was formed for the purpose of operating and carrying on a retail jewelry business in the City of Stuttgart, County of Arkansas, State of Arkansas, and

"Whereas, said partnership business has been successful in its operation and the parties hereto desire to express in writing, certain terms and conditions that they respectively agreed to at the time of the formation of said partnership, and long prior to the execution of this instrument have advised their respective families in regard thereto:

"Now, Therefore, it is mutually agreed by and between the parties hereto that said original oral agreement entered into at the time of the formation of the partnership contained the following conditions, to-wit:

"1—That each of the partners therein and parties hereto did agree and now agree with each other that neither would sell her interest in said co-partnership to any person, firm or corporation whatsoever, except by and with the consent of the opposite partners, both as to price and the person of the buyer.

"2—That each of the partners therein and parties hereto did agree and now agree with each other that in the event of the decease of either of the partners, that all of the partnership assets shall *ipso facto* immediately become the sole and exclusive property of the surviving partner, and that this shall apply to all of the assets of the partnership of Sims & Alexander, whether real estate, personal estate, or mixed.

"That the conditions set forth herein of the original partnership agreement were made at the time and for the purpose of inducing each of the partners to use her best efforts to the promotion of the success of the partnership venture; that the said partnership venture has been successful and the parties hereto desire to confirm, in writing, the validity of the original agreement between them, and do hereby ratify and confirm to each other the terms and conditions herein mentioned and set forth.

"In Witness Whereof, each of the parties have hereunto set their hands and seals to this agreement executed in duplicate on this 14th day of October, 1949.

/s/ Marguerite E. Sims
First Party
/s/ Helen S. Alexander
Second Party."

serious malignancy disclosed by the operation and the doubtful prognosis.[3] He testified:

"Q. When you first saw her on the 15th, was she in a good frame of mind?

"A. When I went to have a conference with her?

"Q. Yes, sir.

"A. I think so; yes, sir.

---

[3] Here are some of the other excerpts from the doctor's testimony:

"Q. To refresh your memory, doctor, didn't you tell her her condition the day she went home, on the 15th of October?

"A. As I recall it, before she went home, she wanted to know what to do and I told her it would be necessary for her to come back and have additional treatment, X-ray treatment. That brought up the question of this thing in the lung again and I think that I could say that on or about this date Miss Marguerite knew that the condition in her lung was a spread or metastasis of the cancer in the pelvis."

. . . . . . .

"Q. Just tell the substance of that conversation between you and Miss Sims on what you designate as the 15th of October, 1949?

"A. When Miss Sims was ready to go home, she had some very definite things in mind that she wanted to ask me, such as procedure and she said, 'was the tumor removed' and I said, 'no' and she said 'why,' and 'why didn't you take it out,' and I had to tell her we didn't think it was the thing to do, we thought it would respond better to X-ray treatment. That brought up again the question of the pathology of the lung—the pathology in her lung, and she asked what we were going to do about that and I told her that we were going to have to use X-ray on that, too, Miss Marguerite. In connecting the two things, I don't think there was any doubt about Miss Marguerite knowing."

. . . . . . .

"Q. Did the information you gave her seem to disturb her mental condition—upset her?

"A. Yes, sir, I think she was upset about it.

"Q. What demonstration did she make?

"A. She cried and was upset. She wanted to know if there was anywhere else I thought she could get better treatment than what we had available locally here.

"Q. And that was the first time that you had told her of the seriousness of her condition?

"A. Yes, sir.

"Q. And you are convinced then that she knew she had a cancer?

"A. I am satisfied in my mind she did.

"Q. From what you told her there at that time?

"A. I think any of us would recognize the fact. Miss Marguerite was more than the usual business woman. I think she was a highly intelligent woman and when we told her we couldn't remove the tumor and were going to have to use X-ray—why, I think any of us would appreciate the fact there was malignancy."

"Q. And she broke down and cried when you told her her true condition?

"A. Yes, sir.

"Q. And that was the first time she had point-blank asked you just what her condition was?

"A. Yes, sir. That is, as to this extent. I think after the operation she wanted to know what was done and I told her that we took some sections of tissue, but I did not ever, until the day she went home, as I recall, go into any detail about the thing at all."

(f) Thus, on October 15th, one day after she had signed the agreement with Mrs. Alexander, Miss Sims learned that her days were numbered. The same day she went to her parents' home at Hazen. But on October 31st, Miss Sims returned to the hospital for treatment, and remained until November 12th. On that last mentioned day, Miss Sims, accompanied by nurses, was taken to her parents' home in Hazen, and remained until December 27th, when she returned to the hospital, where she stayed until her death on April 10, 1950.

(g) Mrs. Alexander continued to visit with Miss Sims, but on February 14, 1950, Mrs. Sims (mother of Marguerite Sims) called Mrs. Alexander and asked that she forward a copy of the agreement. This was done the next day. Then, on February 21, 1950, Miss Sims executed her will, § 2 of which provides:

"I give, devise and bequeath to my father, I. T. Sims, and to my mother, Bessie B. Sims, share and share alike, my entire interest in the partnership of Sims and Alexander, composed of myself and Helen S. Alexander, engaged in the jewelry business in Stuttgart, Arkansas. It is my desire and wish that this partnership be liquidated, and the share coming to me paid to my said parents, out of which they shall reimburse themselves for their expenditures in my behalf during my illness, retaining the residue as a bequest from me."

(h) Miss Sims died on April 10, 1950, and on May 26, 1950, the executor of her estate filed the present suit, with the result as heretofore mentioned.

So much for the recital of facts. The decision in this case turns on the agreement, dated October 14, 1949, and relied on by Mrs. Alexander. Absent any question of consideration, testamentary nature, or fraud on a partner or his creditors, spouse, heirs, etc., some courts have upheld a partnership agreement in which each partner agrees that the survivor will receive all of the assets of the partnership,[4] but such an agreement is always subjected to the closest scrutiny to see if the utmost good faith was observed.

Mrs. Alexander makes three claims regarding the agreement here involved. First, she claims that from the beginning of the partnership in 1942, there had been an oral agreement that in the event of the death of one partner, the other would receive all of the partnership assets; but she does not rely on this oral agreement as binding. Secondly, Mrs. Alexander claims that the original agreement was at one time reduced to writing by Miss Sims and the written instrument was lost; but Mrs. Alexander's case is not now predicated on proving a lost instrument, and the evidence in the record is not sufficient to sustain such claim. Finally, Mrs. Alexander claims that the agreement of October 14, 1949, was to make a valid, acknowledged memorial of the original agreement; and we conclude that the claims regarding an oral agreement and a prior written agreement, merely go to the extent of showing that there had been some discussion between the partners about something that they might do in the future.

We come to the conclusion then that on October 14, 1949, Mrs. Alexander obtained the execution of the written agreement, when her partner, Miss Sims, was ignorant of her impending death, and when Mrs. Alexander, knowing such fact, did not divulge it to Miss Sims. Under these circumstances, we think that Mrs. Alexander

[4] See *McKinnon* v. *McKinnon*, 56 Fed. 409; *Michaels* v. *Donato* (N. J.) 67 Atl. 2d 911; and other cases cited in the Annotations in 73 A. L. R. 983 and 1 A. L. R. 2d 1207. See, also, 40 Am. Jur. 347.

failed to observe and obey the rule which requires partners to exercise the utmost good faith in their dealings with each other. In *Drummond* v. *Batson,* 162 Ark. 407, 258 S. W. 616, Mr. Justice HART said (page 421): "Partners are bound to conduct themselves with good faith towards each other, . . ." The Uniform Partnership Act (Act 263 of 1941) recognizes this rule. See *Zack* v. *Schulman,* 213 Ark. 122, 210 S. W. 2d 124, 2 A. L. R. 2d 1078.

In Story on "Partnership", the author traces the duties of partners *inter se* from the Roman Republic to the present time. On page 291 of the 4th Edition, this appears: "The necessity of entire good faith, and of the absence of fraud on the part of partners towards each other, is inculcated by Cicero in terms of deep import and sound morality . . . Good faith not only requires, that every partner should not make any false representations to his partners, but also that he should abstain from all concealments, which may be injurious to the partnership business."

In Burdick on "Partnerships", 3rd Edition, page 320, the text states: "One of the cardinal obligations of a partner is to exercise perfect fairness and good faith towards his associates in all partnership matters . . . A partner, who seeks to acquire his co-partner's interest in the firm, is bound to act with the utmost frankness and honesty."

In Gilmore on "Partnership" (Hornbook Series), the rule is stated on page 374: "Partnership is a relation of trust and confidence, and partners must observe the utmost good faith towards each other in all of their transactions, from the time they begin negotiations with each other, to the complete settlement of the partnership affairs."

In 40 Am. Jur. 217, *et seq.,* the holdings from cases generally are summarized: "The relationship of partners is fiduciary and imposes upon them the obligation of the utmost good faith and integrity in their dealings with one another with respect to partnership affairs. . . . The partners must not deceive one another by concealment of material facts . . . The general rule that

the utmost good faith is required of partners in their relationship with each other, and that, since each is the confidential agent of the other; each has a right to know all that the others know and each is required to make full disclosure of all material facts within his knowledge in any way relating to partnership affairs, is held almost universally to apply in the case of a sale by one partner to another of his interest in the partnership.''

There is an Annotation in Ann. Cas. 1912D, page 1245, in which cases are cited from a score of jurisdictions to sustain this statement: ''The relation of partners is such that in a sale of his interest in the partnership by one partner to another, the utmost good faith must be observed, and the concealment of any important fact or the failure fully to disclose all knowledge affecting the value of the partnership, or the interest proposed to be sold, or any fraud of any kind, will operate to defeat the sale.''

In the case at bar, the effect of the agreement which Mrs. Alexander caused to be prepared and signed by Miss Sims, was the same as a sale of Miss Sims' interest in the partnership. Mrs. Alexander knew that Miss Sims had only a short time to live, and that the effect of the instrument was for Miss Sims to give all her interest in the partnership to Mrs. Alexander. Yet, Mrs. Alexander, knowing all these facts, did not disclose them to Miss Sims when the agreement was signed, and Miss Sims did not learn of her serious condition and impending death until the next day. We hold that under these circumstances, the agreement was susceptible of being set aside. That Miss Sims did renounce the agreement is thoroughly shown by her will, in which she bequeathed her interest in the partnership to her parents. The validity of the will is not attacked, and it clearly proclaims that Miss Sims renounced the agreement here relied on by Mrs. Alexander. This suit was to accomplish and complete such renunciation.

For the reasons herein stated, the decree of the Chancery Court is affirmed.