Arthur M. VOGEL, Plaintiff,

v.

Lonnie E. BREWER, Defendant.

Civ. A. No. 298.

United States District Court
E. D. Arkansas, N. D.
Sept. 23, 1959.

Kaneaster Hodges, Newport, Ark., for plaintiff.

Fred M. Pickens, Jr., Newport, Ark., for defendant.

HENLEY, Chief Judge.

This cause having been tried to the Court, and the Court being well and sufficiently advised doth hereby make the following findings of fact and doth state the following conclusions of law, to wit:

### Findings of Fact

1. This is an action brought by the plaintiff, Arthur M. Vogel, a citizen of Mississippi, against the defendant, Lonnie E. Brewer, a citizen of Arkansas, to dissolve a partnership that had existed between the parties since 1939, and to secure a sale of the partnership assets and an accounting. Subsequent to the filing of the suit, an order was entered dissolving the partnership and directing the sale of the assets. A sale was held, and $14,100 was bid by the defendant, who became the purchaser at the sale. Prior to the sale it was agreed that if either partner became the purchaser, he would be required to pay only one-half of the bid price, plus $1,000. Pursuant to this agreement, the defendant paid $8,050 into the registry of the Court. By subsequent order, $6,050 of this sum was disbursed to the plaintiff, and after paying the expenses of the sale, including the fee of the special master who conducted it, there remained the net sum of $1,892.15, which has been deposited in the registry of this court.

2. In 1939 the parties hereto formed a partnership for the operation of cut-rate gasoline filling stations. The initial capital, since recovered out of partnership earnings, was advanced by plaintiff. Under the articles of co-partnership defendant was to devote his full time to the management of partnership affairs and plaintiff was to devote as much time as was practicable to the partnership business. In practice most of the partnership business was handled by the defendant and at times when defendant actually operated (as distinguished from merely managing) one or the other of the partnership properties, defendant drew special compensation therefor. From time to time plaintiff participated in making of partnership decisions but he never personally operated any of the partnership properties and except for recovery of the initial capital never, so far as this record shows, drew or was entitled to draw more than his share of the partnership profits. Except as otherwise stated in this paragraph the partners were to share equally in the venture. Although the partnership relation was maintained for almost twenty years, it does not appear that the relationship was harmonious, and during the final years of the operation it deteriorated very seriously.

3. During the life of the partnership two filling stations were acquired and operated. The first of those stations, located at Neeleyville, Missouri, was acquired in 1939 and was sold in 1955. The second station, located at Newport, Arkansas, was acquired in 1941 and was operated up until the close of the partnership business. Both of the stations were at first operated by the partnership, but both were later leased to others with the rent being computed on a gallonage basis.

4. When the Newport station was acquired, the defendant moved to Newport from Neeleyville and operated the station for the partnership until it was leased. In the meantime, the plaintiff, who had originally lived in the vicinity of St. Louis, had moved to Mississippi. The original rent on the Newport station was two cents per gallon, plus $45 per month on account of the lease on the real estate. Rentals were paid monthly, and the lessees would mail separate checks to the two partners, each check being for the same amount. There were several lessees of the Newport station, the last one being Frank McCoy, who both sides agree was an efficient operator and a satisfactory tenant.

5. After the lease of the Newport station the defendant did not entirely disassociate himself from its operation. He rendered assistance to the tenants, particularly McCoy, in handling relations with wholesalers and working out demurrage problems which would arise from time to time in connection with rail shipments of gasoline. He also appears to have had general responsibility for the maintenance and repair of the physical premises and he gave some minor assistance to McCoy in making collections. He was not otherwise employed during this period. It appears from the evidence that the plaintiff would come to Newport occasionally to look into the affairs of the partnership, but it is not clear as to just how often he would come or as to what he would do when he was there.

6. As stated, the partnership has been dissolved and the assets sold. There re-

mains the question of an accounting between the parties, which presents three areas of controversy:

The first dispute arises from the fact that the sale of the Neeleyville station produced $7,500, only $3,500 of which was remitted to the plaintiff, the balance of $4,000 being retained by the defendant who actually made the sale, acting for himself and under a power of attorney executed by the plaintiff. The plaintiff contends that the defendant should be required to account for one-half of the extra $500, which is denied by the latter.

The second dispute involves certain alleged rentals received by the defendant after February, 1953 following an agreement between the parties for a reduction of the rental to be collected from Mr. McCoy. The details of that dispute hereinafter will be stated more fully.

The third dispute involves the question of the plaintiff's obligation to pay one-half of the purchase price of two new gasoline pumps which were acquired and installed by the defendant and McCoy sometime in 1957 for a total price of $1,360. Those pumps were bought without the plaintiff's prior knowledge or consent, one-half of the price being advanced by the defendant, and the other half by McCoy. In July, 1957 a conference was had at Newport between the plaintiff and the defendant which culminated in the latter giving to the former a written statement in the following language: "This is to certify that A. M. Vogel is one half owner in new gasoline pumps at Newport Station. Signed L. E. Brewer." Subsequently, Mr. McCoy, over the objection of the plaintiff, deducted from the latter's rentals the portion of the purchase price of the pumps, $680, which he had advanced originally. The dispute over this $680 is closely connected with and must be considered in light of the controversy over rentals from the Newport station.

7. The parties agreed that the Neeleyville station should be sold, and the defendant set about finding a buyer, making several trips from Newport to Neeleyville for that purpose. Having

found a sale for the property at a price of $7,500, defendant telephoned the plaintiff and, without disclosing the amount of the sale price, asked the plaintiff whether he would take $3,500 for his interest. Plaintiff replied that he would take such a sum, whereupon defendant concluded the sale and remitted $3,500 to plaintiff.

As justification for his failure to disclose the amount of the sale price of the station and for his retention of the extra $500 the defendant testified that there was an express agreement between him and the plaintiff to the effect that if either of the partners was able to make the sale he would be entitled to keep all sums in excess of $2,900. By way of explanation of his remittance of $3,500 rather than $2,900 the defendant testified that his wife was of the opinion that it would not be fair to the plaintiff for the defendant to retain the full difference between $7,500 and $2,900, and that he acquiesced in her view to the extent that he was willing to pay the plaintiff $600 more than the latter was entitled to under the agreement.

While on this point, as on others, the testimony of the plaintiff was not entirely clear, he did deny that he ever made the agreement which the defendant claimed that he made.

The burden of establishing by a preponderance of the evidence the existence of the agreement relied upon was upon the defendant, and the Court does not feel that he has sustained that burden. As stated, his testimony with regard to the agreement was contradicted by that of the plaintiff, and, while there is no doubt that there were discussions between the parties relative to the sale of the Neeleyville station in the course of which the sum of $2,900 was mentioned, no reason appears which would prompt the plaintiff to agree to take $2,900 for his interest without regard to the price for which the station actually sold. The Court is unable to find that he did so agree.

8. Coming now to the controversy about the moneys paid to the defendant after February, 1953, the evidence discloses that prior to that month a price war had broken out among filling station operators in Newport, and that the increased competition prompted the tenant, Mr. McCoy, to ask for a reduction in his rent.

This request having been made, the plaintiff came to Newport, where he and the defendant held a conference on the filling station premises but out of the presence of McCoy. It is not disputed that in the course of that conference it was agreed that the plaintiff would reduce his rent to ½ cent a gallon but there is a sharp dispute as to how much of a reduction the defendant agreed to take. It is the theory of the plaintiff that the defendant was to reduce his rental to ½ cent a gallon also, which would have cut Mr. McCoy's rent in half. The defendant contends, however, that the agreement was that while plaintiff's rental was to be reduced to ½ cent a gallon, he himself was not to take so extreme a reduction but was to be paid ¾ths of a cent. Thus, under the defendant's theory Mr. McCoy was to get a reduction of ¾ths of a cent a gallon, rather than a full cent.

The dispute just outlined represents the first phase of the controversy now under discussion; that controversy has a second aspect arising from the fact that after February, 1953 McCoy did not pay the defendant ¾ths of a cent and the plaintiff ½ cent, but actually continued to pay the defendant the full one cent per gallon that he had been receiving theretofore while paying only ½ cent to the plaintiff. With respect to this final ¼th cent, (the difference between ¾ths of a cent and one cent), the plaintiff contends that it was additional rent paid to the defendant by McCoy, and that the defendant must account for one half of it. The defendant argues, on the other hand, that the final ¼th cent paid to him was not rental but was compensation for personal services that he rendered McCoy.

9. The testimony of the parties as to the terms of the agreement was sharply conflicting, but the Court finds from a preponderance of the evidence that there was an agreement that the rent of the plaintiff was to be reduced to ½ cent per gallon, whereas the rent of the defendant was to come down to ¾ths cent. The defendant's testimony on this point is corroborated by a letter written to him by the plaintiff in 1957, and by the testimony of the defendant's attorney.

After all, there was reason for the defendant to receive somewhat more rent than the plaintiff. The former was on the ground, and, as has been said, he was performing certain services that were of value not only to Mr. McCoy but to the partnership as well. It was doubtless contemplated that those services were to continue, and they did in fact continue.

10. Coming now to the controversy over the final ¼th cent, Mr. McCoy testified that after the parties had their conference on the filling station premises, the plaintiff left. He further stated that thereafter the defendant came into the station and told him that it had been agreed that thenceforward the plaintiff was to receive ½ cent a gallon, and the defendant was supposed to take ¾ths of a cent. The defendant also stated, however, that he did not see how he could get along on a reduced rental.

There was no further discussion of the matter between McCoy and the defendant, but sometime during February the defendant was able to obtain for McCoy a reduction in the wholesale price of gasoline, which in itself gave McCoy some relief, and when the February rent came due, McCoy paid the defendant the full one cent per gallon which he had been paying him, while remitting ½ cent to the plaintiff, and he followed the same practice with respect to subsequent months down to the winding up of the partnership.

It is true that the defendant performed services for McCoy after the agreement for a reduction of the rent was made, but it appears that the services that he performed did not differ appreciably either qualitatively or quantitatively from those which he had performed theretofore, and which he was under duty to continue to perform in justification for receiving the first ¼th cent additional rental. In checks drawn in favor of the defendant after February, 1953 McCoy did not differentiate between rental and personal services, and the checks indicated that they were given entirely in payment of gallonage rental and on account of the real estate lease, payments on account of the latter not having been affected by the rental reduction agreement. Nor did McCoy withhold any sums from the defendant's checks on account of income or social security taxes; nor did he himself pay any social security taxes with respect to the defendant.

As the Court sees it, McCoy knew that the defendant would not be satisfied if his rental payments were reduced to ¾ths of a cent a gallon and did not insist upon availing himself of that reduction. With the lower wholesale prices that he was paying, he apparently felt that he could get along with a ½ cent reduction in rent, all of which was taken from the plaintiff.

11. The Court finds from the evidence that from February, 1953 through September, 1958 2,297,956 gallons of gasoline passed through the Newport station and that based on that gallonage McCoy paid rental to plaintiff and defendant amounting to the sum of $34,469.34. Of this sum the plaintiff received $11,489.78 representing ½ cent a gallon rental, and the defendant received $22,979.56 representing a full one cent rental.

Assuming that the defendant must account to the plaintiff for ½ of the ¼th cent differential between the ¾ths of a cent that defendant was entitled to receive and the full cent that he did in fact receive, the Court finds that the 1½ cent a gallon rental that was paid should be apportioned as follows: ⅝ths of a cent to the plaintiff and ⅞ths of a cent to the defendant. Using this apportion-

ment, it appears from calculation that the defendant was entitled to receive $20,-107.115, whereas he actually received $22,979.56, an overpayment of $2,872.445, and that the plaintiff was entitled to receive $14,362.225, whereas he actually received only $11,489.78, an underpayment of $2,872.445. This calculation may be conveniently expressed by means of the following table:

Using a Total Gallonage of 2,297,956 and a Total Rental of 1½ Cents Per Gallon

Plaintiff's Share Based Upon:

| | | Entitled To Receive | Actually Received |
|---|---|---|---|
| a. | ½ of first cent: | $11,489.78 | $11,489.78 |
| b. | Next ¼ cent: | 000.00 | 000.00 |
| c. | ½ of final ¼ cent | 2,872.445 | 000.00 |
| | | $14,362.225 | $11,489.78 |

Difference: $2872.445 Equals Plaintiff's Underage

Defendant's Share Based Upon:

| | | | |
|---|---|---|---|
| a. | ½ of first cent: | $11,489.78 | $11,489.78 |
| b. | Next ¼ cent: | 5,744.89 | 5,744.89 |
| c. | ½ of final ¼ cent | 2,872.445 | 5,744.89 |
| | | $20,107.115 | $22,979.56 |

Difference: $2872.445 Equals Defendant's Overage.

12. The findings just made render it necessary to pass upon the dispute relative to the pumps. While the plaintiff earnestly contends that there was no agreement between him and the defendant whereby the latter was to receive ¾ths cent rental as compared to his own ½ cent, and while he denies that he had any firm knowledge in 1957 that a differential in fact existed, he contends, in the alternative, that if it should be found that he agreed to the differential or acquiesced therein, then by virtue of the writing given him in July, 1957, which has heretofore been quoted, it should be adjudged that the defendant was required to pay the full price of the pumps, and should now be required to reimburse him for the $680 deducted from his rentals by McCoy. This contention is expressed in the plaintiff's brief in the following language:

"If * * * the court concludes that * * * plaintiff has no relief against defendant for the first extra one-fourth (cent), then plaintiff urges that in July, 1957 the defendant, in his anxiety to prevent plaintiff discussing an increased rental with Mr. McCoy and as a recompense for the original allowance to defendant of the first extra one-fourth if that actually occurred, the defendant freely and fairly agreed with plaintiff that he, the defendant, would pay plaintiff's portion of the cost of the pumps in the amount of $680."

While the evidence on this issue is not entirely satisfactory, nevertheless after a consideration of all of the testimony the Court finds from a preponderance of the evidence that in July, 1957 the plaintiff was not willing to contribute to the cost of installing new pumps unless he received more rental, and the defendant was apprehensive that if the plaintiff approached McCoy and demanded more rent, the latter would give up his lease. The Court further finds that the parties

did agree, in effect, that if the plaintiff would not disturb McCoy about the rent, the defendant would pay the full cost of the pumps and would give the plaintiff an undivided one-half interest therein, and that the written instrument evidenced that agreement. The Court further finds that the plaintiff kept his part of the agreement; he did not demand additional rent from McCoy and left town without talking to him; the defendant, on the other hand, instead of re-imbursing Mr. McCoy for the moneys that he had advanced for the purchase of the pumps, instructed McCoy to deduct the $680 that he had paid from the rents subsequently accruing to the plaintiff.

The substance of the agreement appears to the Court to be established by the admissions in the defendant's own testimony. He stated that plaintiff was unwilling to contribute to the cost of the pumps unless his rent was increased, that McCoy would have abandoned the lease if the rent were increased, and that he executed the "certificate of ownership" for the express purpose of preventing the plaintiff from disturbing McCoy.

It is not to be overlooked in this connection that, the defendant was not receiving ¾th cent per gallon from McCoy, but a full cent, a fact which was unknown to the plaintiff at the time, and which he did not discover until after this suit was filed and the defendant's discovery deposition taken. The defendant must have known that the plaintiff would object vigorously to that situation, as he did when he discovered its existence, and he also must have known or at least feared that if the plaintiff interviewed McCoy with regard to raising the rent, the true state of facts would come to light. Thus, the defendant not only was interested in keeping McCoy satisfied, but also in preventing the plaintiff from finding out about the final ¼th cent that McCoy was paying.

### Conclusions of Law

1. This court has jurisdiction of this cause and of the parties hereto.

2. The defendant must account to the plaintiff for one-half of the extra $500 that the defendant withheld out of the proceeds of the sale of the Neeleyville, Missouri station.

The Court is willing to assume, at least for present purposes, that in the absence of fraud or overreaching it is competent for two partners both sui juris, and with full knowledge of all material facts, to agree that if either of them can find a sale for partnership assets, he may retain out of the proceeds all moneys above a certain amount, to be paid to the other in full satisfaction of his interest, without regard to what the property actually brings, and without regard to the fact that the amount retained by the seller may be entirely disproportionate to his interest in the partnership. As heretofore pointed out, the defendant sought to justify his action in keeping $4,000 out of the sale of the Neeleyville station upon the existence of such an agreement, but in the Court's estimation he failed to establish by a preponderance of the evidence that such an agreement was ever made. Hence, his action cannot be upheld on that basis.

It is true that the plaintiff said that he would take $3,500 for his interest in the station, and it does not appear that he made any inquiry as to the amount of the sale price; but these men were partners, and the relationship between them was in the highest degree fiduciary. In such circumstances the Court is of the opinion that the plaintiff had the right to assume that if he was receiving $3,500, the property was being sold for $7,000. If it was being sold for more the defendant owed an affirmative duty to disclose the true sale price. Since this was not done, the defendant must account for the additional $500. See Alexander v. Sims, 220 Ark. 643, 249 S.W.2d 832; Sheptaw v. Sewell, 185 Ark. 812, 49 S.W.2d 601; Drummond v. Batson, 162 Ark. 407, 258 S.W. 616; and Crawford v. Stainback, 76 Ark. 346, 88 S.W. 991, which make it clear that transactions between partners, if they are to

stand, must be characterized by the utmost good faith and full disclosure of material facts known to one of the partners and unknown to the other. This is in accord with the general rule stated in 40 Am.Jur. "Partnership," Sections 128 et seq. While the case at bar is not factually identical with any of the Arkansas decisions above cited, the Court is convinced that the principles announced in those cases are applicable here. Plaintiff was entitled to know out of what larger sum the $3,500 that he was to receive was to be paid, and the defendant, having failed to disclose that information, must account for the extra money that he retained.

3. The Court having found that there was an agreement whereby the defendant was to receive ¾th cent per gallon, defendant will not be required to account for any portion of the difference between ½ cent and ¾th cent that he received.

4. The agreement between the parties to the effect that the defendant should pay the full cost of the new pumps and that the plaintiff should have a half interest therein was a valid and enforceable contract, the consideration being the promise of the plaintiff not to demand any additional rent from McCoy. In view of this agreement it was the duty of the defendant to re-imburse McCoy for the funds that he had advanced for the initial purchase of the pumps, which obligation the defendant breached. As a result of his breach the plaintiff was required to bear one-half of the cost of the pumps amounting to $680, and he is entitled to recover that sum from the defendant.

5. From the finding of the Court that the differential between ¾ths of a cent and one cent received by the defendant after February, 1953 was rent and not compensation for services rendered the lessee it follows that the former must account to the plaintiff for one-half of this differential, or $2,872.45. It must be remembered that although the lessee paid his rent by separate checks in favor of the respective partners, the rent so paid was partnership income, and the defendant was not entitled to more than his share. The payment of the additional ¼th of a cent rent was not contemplated by the rental reduction agreement and was not covered thereby nor was it affected by the pump agreement; hence, that additional rental must be divided equally in accordance with the original partnership agreement. It would be violative of the plainest principles of equity to permit the defendant, knowing that his partner had reduced his rent by one-half, and that he himself was supposed to reduce his own by one-quarter, to continue to receive his full share of the rent under the original agreement while permitting the plaintiff, who was in ignorance of the true situation, to bear the full burden of the relief that it had been deemed desirable to afford the tenant.

6. In summary, the plaintiff is entitled to draw down his one-half of the $1,892.15 now in the registry of the Court. He is likewise entitled to judgment against the defendant in the sum of $3,802.45 which the Court declares to be a first lien on the latter's half of the said sum of $1,892.15, which half the Clerk will also disburse to the plaintiff. After such has been done, there will remain a deficiency in favor of the plaintiff in the sum of $2,856.37, which he may collect by available process in the form and manner provided by law.

A final decree in accordance with the foregoing will be entered.